UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIE JACKSON, JR.,

              Petitioner,           **DECISION AND ORDER**

    -vs-                      **No. 09-CV-1054(MAT)**

ROBERT ERCOLE,

              Respondent.
_____

## I.   Introduction

Willie Jackson, Jr. ("Jackson" or "Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Jackson is currently incarcerated pursuant to multiple murder, attempted murder, and conspiracy convictions. For the reasons that follow, the petition is dismissed.

## II.  Factual Background

Petitioner originally was charged with two counts of murder in the first degree, two counts of murder in the second degree, and one count each of attempted murder in the first and second degree in connection with the killing of Lois Miller ("Lois") and Brionna Miller ("Brionna") and the attempt to kill Crystal Miller ("Miller") on March 4, 2003, at Lois's house at 267 Bissell Street in Buffalo, New York. Brionna was Petitioner's daughter with Miller. Lois was Brionna's grandmother.

Subsequently, Petitioner was charged with two counts of conspiracy in the second degree and two counts of criminal

solicitation in the second degree based upon his instigation of a plot to kill Miller and Brian Stepp ("Stepp").

At a consolidated trial of both indictments, Miller testified that Petitioner came by Lois's home at around 11:30 p.m. dressed in a black skull cap and a long black leather coat. Petitioner said he had to drop off a tape, but he did not have it with him. Petitioner left, telling her he had left the tape in his truck, a White Jeep Cherokee, and would be back with it. He did not return with the tape, however.

Khali Peoples ("Peoples"), a friend of Petitioner's, related that Petitioner had arrived at Lois' home at around 11:45 p.m. that night. They were supposed to be going out for drinks. Petitioner appeared to be "rushed" and he said he had to "make a move". Petitioner wanted to know if Peoples had access to a gun; Peoples said no. Petitioner then displayed some cash and told Peoples he would pay him for obtaining a gun. At that point, Petitioner left, promising to call Peoples later. Petitioner did not call.

At about 3:00 a.m., Miller heard a knock at the door of her mother's apartment, followed by her mother's and Petitioner's voices. She heard her mother say, "Oh, Junior." (Petitioner was also known by the nickname "Junior.")  This was followed by a single gunshot and the sound of something falling to the ground (Miller's mother). As Miller tried to get up from her bed, she was shot in the head by Petitioner. Brionna, who was sleeping in the bed with

Miller, was fatally shot by Jackson. Bleeding profusely, Miller managed to crawl her way to the foyer.

Clarene Frank ("Frank"), who had come to the other apartment at 267 Bissell to buy drugs, stated that as she approached the house, she saw a black man dressed in a long black leather coat shutting the door behind him. The man looked both ways and ran away from the house.

Frank knocked on the door and Miller, bleeding profusely, eventually opened it. Miller said to Frank, "He shot me. Her father, he shot me." Scared, Frank ran away, stopping to rouse some nearby neighbors to ask them to call the police.

Responding officer Joy Negron ("Officer Negron") and her partner Jeffrey Giallella observed Miller prone on the porch, bleeding from the head and unable to speak due to the amount of blood filling her mouth. When Officer Negron asked whether Miller knew who had shot her, Miller, unable to speak, nodded her head yes. The officer continued to question Miller, but all she could make out was the word "father." Eventually, in response to Officer Negron's questioning about the identity of the shooter, Miller scrawled "J-A-C-K-S-O-N, W-I-L-L-I-E" and the address "261 LISBON" in the snow on the porch.

The police went to the house on Lisbon where they spoke to Petitioner's sister, Evelyn Jackson, who described her brother's residence on Olympic and his vehicle. The police were able to find

the house and truck at 336 Olympic. The truck, unlike other cars on the street, had no snow on it and the hood was warm.

Petitioner stuck his head out of an upstairs window in response to the police knocking on the door, but did not answer. The police ultimately had to break down the door, where they found a long black leather coat, black pants, and a black hat strewn about in an otherwise tidy living room. There were latex gloves and black leather gloves inside Petitioner's Jeep Cherokee. Later, a "Broncos" sweatshirt was recovered from a hole in the bathroom wall.

Microscopic particles indicating close proximity to, or contact with, a discharged firearm were found on the leather coat, the sleeves of the sweatshirt, the pant legs, and the leather gloves. Petitioner denied ever firing a gun, commenting that he did not like guns. He also denied having been at the Bissell Street residence in months.

During July 2003, while incarcerated at the Erie County Holding Center, Petitioner met a fellow inmate named Brian Talley ("Talley"). Petitioner told Talley that he had shot three people and gave certain details about the shooting. He said that he wanted Talley to kill Miller in order to prevent her from testifying. He also wanted Talley to eliminate Brian Stepp ("Stepp"), with whom he was angry for taking over his apartment and belongings after his arrest.

New York State Police Investigator Dorothy Jones ("Inv. Jones") posed as Talley's friend and potential hitwoman, "Sister Bishop."

-4-

Petitioner told Inv. Jones that he wanted Miller and Stepp killed. As far as the preferred method, Petitioner said that he wanted there to be no chance of survival.

Petitioner was found guilty after trial of all charges. He was subsequently sentenced to life without parole.

## III. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

## IV. Discussion

### A. Ground One: Introduction of Inculpatory Statements in Violation of Sixth Amendment Right to Counsel

#### 1. Overview

Under <u>Massiah v. United States</u>, 377 U.S. 201 (1964), "once the right to counsel has attached by the filing of a formal charge, any incriminating statements concerning the charge that the state knowingly elicits from the accused without counsel present are inadmissible at trial." <u>Mealer v. Jones</u>, 741 F.2d 1451, 1453 (2d Cir. 1984) (citing <u>Massiah</u>, 377 U.S. at 206), <u>cert. denied</u>, 471 U.S.

1006 (1985); accord, e.g., Maine v. Moulton, 474 U.S. 159, 180 (1985).[1]

As defined by Massiah, the Sixth Amendment imposes on the government "an affirmative obligation" to "respect and preserve" this choice, and the government cannot "act in a manner that circumvents and thereby dilutes" this Sixth Amendment right. Moulton, 474 U.S. at 170-71. Accordingly, even when the government legitimately investigates other, unrelated crimes, it may not elicit from the defendant and ultimately use against him "incriminating statements pertaining to pending charges" if in obtaining the evidence the government "knowingly circumvent[s]" the defendant's right to counsel. Id. at 180.

Petitioner contends that the trial court erred under Massiah in denying his motion to suppress statements that he made to an inmate who was cooperating with the police, and to an undercover police officer posing as Talley's friend and a potential hitwoman. According to Petitioner, the inmate and the undercover officer were precluded from questioning him with respect to the then-uncharged crimes of conspiracy and criminal solicitation because his right to counsel on the murder charges had attached.

### 2. Factual Background and Procedural History Regarding Petitioner's Sixth Amendment Claims

---

[1]

Because the right to counsel has attached with regard to one charge, however, a defendant is not shielded from investigation of other criminal conduct committed thereafter. "Therefore, where the post-indictment statements elicited in the absence of counsel concern a new (i.e., as yet uncharged) crime, those statements are admissible in a subsequent trial on the new crime." Mealer, 741 F.2d at 1455 (citations omitted); accord, e.g., Moulton, 474 U.S. at 180.

While in jail in July of 2003, Jackson met Talley, an inmate, who was not an agent of the State at the time. Jackson told Talley that he had shot three people, and discussed the identity of the victims, and the circumstances leading up to the shootings which corroborated Miller's testimony.  Jackson stated that he "emptied" his gun during the shooting; he obtained the murder weapon from a friend and returned it to that friend after the shooting. The reason for the shooting was that Miller was pestering him for more child support.

Jackson inquired whether Talley would act as a "hit man" and kill Miller and Stepp, explaining that he was angry with Stepp for taking over his apartment and belongings after his arrest.  Jackson said that he would pay Talley and his accomplice $10,000 to kill Miller and Stepp, and provided physical descriptions of the intended victims (including a photograph of Miller from the newspaper) and maps of their residences.

Inv. Jones of the New York State Police was recruited to pose as Talley's accomplice, "Sister Bishop," in order to gather information about the as-yet uncharged conspiracy to kill Miller and Stepp. Jones was specifically directed not to ask Jackson about the underlying murders and attempted murder for which Jackson had already been indicted.

Although Inv. Jones had made a "yeoman's effort" not to deliberately elicit information about the murders, it was extremely difficult under the circumstances. Nevertheless, the suppression

court denied the motion to suppress the statements made by Petitioner to Inv. Jones, but noted that he would "entertain motions in limine . . . with regard to anything that might have been said pertaining to the underlying charges during the meetings between" Inv. Jones and Petitioner.

Defense counsel did not move in limine for suppression but did object to several references by Petitioner to Inv. Jones regarding the murder charges. During a discussion about how to kill the witnesses so that there was no chance of survival, Inv. Jones suggested shooting them with a Beretta. Over objection, Inv. Jones testified that Petitioner had remarked to her that he was "shocked that [Miller] survived after taking two shots to the head." Inv. Jones also testified that during a discussion about payment for the killing of Stepp and Miller, Petitioner had said that Miller would not make a good witness anyway, since she had not seen his face. According to Inv. Jones, Petitioner said "her grandmother seen [sic] his face, said his name" but Miller had not seen him.

The Appellate Division held that the suppression court had correctly admitted the statements, finding there was no right-to-counsel violation because the murder charges were not transactionally related to the uncharged crimes of inchoate conspiracy. People v. Jackson, 41 A.D.3d 1268, 1269 (N.Y. App. Div. 4th Dept. 2007) (citing, inter alia, People v. Cohen, 90 N.Y.2d 632 (N.Y. 1998)). The Appellate Division held that merely because victim of the attempted murder charges was the subject of the murder plot

that formed the basis of one of the uncharged conspiracy charges was not dispositive. Id. The Appellate Division did not cite any Federal law in its analysis.

The Court agrees with Jackson's appellate counsel that the Appellate Division applied New York State cases which were not apposite. See People v. Roman, 2 Misc.3d 252, 772 N.Y.S.2d 472 (Sup. Ct Monroe Co. 2003) (Fisher, J.). These cases involved custodial police interrogation, and have never been applied to the scenario in this case. Roman, 2 Misc.3d at 260 (citations omitted).

A State court's erroneous application of State law is not sufficient to warrant habeas relief. See 28 U.S.C. § 2254(a). However, as discussed below, both the suppression court and the Appellate Division incorrectly applied Federal law in an objectively unreasonable manner.

### 2. Analysis of Petitioner's Sixth Amendment Claims Under Massiah

#### a. Statements Made to Informant Brian Talley

Talley did not meet with the prosecution until August 11, 2003. The conversations between Talley and Jackson summarized above occurred before the August 11, 2003, meeting and thus did not fall within the ambit of Massiah. United States v. Stevens, 83 F.3d 60, 64 (2d Cir. 1996) ("[T]he right to counsel is . . . not infringed when a defendant approaches an informant and admits to a crime without any urging on the part of the informant.")(citations omitted). Jackson's Sixth Amendment right to counsel thus was not

violated by the admission of his statements made to Talley prior to August 11, 2003.

With regard to the period of time after August 11, 2003, the suppression court held that "there is no indication that as a result of the meeting from August 11th any additional information was elicited improperly by Mr. Talley at the request or at the urging of prosecutor or police . . . ."  Indeed, Talley did not testify on direct examination to any statements made by Petitioner regarding the pending murder and attempted murder charges after August 11, 2003, when Talley became a police informant. Thus, there was no Sixth Amendment violation with regard to Talley's conversations with Jackson.

> **b.    Statements Made to State Police Investigator Dorothy Jones**

Because the Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State, the State has an affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. Moulton, 474 U.S. at 176.  "The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation." Id.

The State breaches its duty not to circumvent the right to counsel as much by a "knowing exploitation . . . of an opportunity to confront the accused without counsel being present" as by the "intentional creation of such an opportunity." Id. Accordingly,

-10-

Moulton held, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Id.

Observing that direct proof of the government's knowledge will seldom be available to the accused, the Moulton court noted that "proof that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation." Id. at n.12 (quoting Henry, 447 U.S. at 271). Applying this principle, the Supreme Court held in Moulton it "is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant," because it must have known that the pending charges would be discussed when the informant met with Moulton. Id. Accord, e.g., United States v. Bender, 221 F.3d 265, 269 (1st Cir. 2000).

In Bender, the defendant, while he was incarcerated, allegedly spoke with two fellow inmates, on separate occasions, about illicit ways in which he could influence the outcome of his impending trial, including the fabrication of an alibi and the kidnaping and murder of government witnesses who would testify against him. 221 F.3d at 267. The inmates, neither of whom were government agents at the time, reported their conversations with Bender to the authorities. This is essentially what happened in Jackson's case. Talley, after

conversing with Jackson in prison about the murders, approached the authorities and informed them about the conversations.

Subsequently, as in Jackson's case, an undercover officer went to the prison to meet with Bender. As here, the officer in <u>Bender</u> was instructed not to speak with Bender about the pending charges. Bender thought he was meeting with his alibi-for-hire; similarly, Jackson thought he was meeting a potential hitwoman when he spoke with Inv. Jones. During the ensuing conversation, Bender made incriminating statements pertaining to his schemes to hire an alibi witness and a hit man. (In contrast to the situation here, Bender made no admissions pertaining to, the pending charges as such.) The district court denied the government's request to use Bender's statements about the creation of a false alibi as material evidence bearing upon consciousness of guilt involving the felon-in-possession crime. <u>Id.</u> at 268.

The First Circuit held that it "was obvious that questioning Bender about a false alibi for the underlying charges would result in his making incriminating statements as to those charges[,]" and "[t]he same was true of a plot to do away with government witnesses." 221 F.3d at 269. The defendant's statements in <u>Bender</u>, "therefore, were likely to be incriminating as to the pending charges, were deliberately elicited post-indictment, and were obtained in the absence of counsel[.]" <u>Id.</u> Thus, the First Circuit held, "they were obtained in violation of the Sixth Amendment and were rightly suppressed . . . ." <u>Id.</u> (citing <u>Moulton</u>, 474 U.S. at

176 n.12 (that "the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation")); see also Mealer, 741 F.2d at 1455 ("The 'new crime' under investigation here was Mealer's attempt to suborn perjury at the trial on his pending indictment. That crime was intimately related to the pending indictment, and the government must have known that any statements made in the course of suborning perjury would necessarily incriminate Mealer on the murder charge as well.").

Here, the prosecution "'must have known' that its agent [, Inv. Jones,] was likely to obtain incriminating statements from the accused in the absence of counsel," Moulton, 474 U.S. at 176 n. 12, which "suffices to establish a Sixth Amendment violation." id.  In determining that Jackson's statements to Inv. Jones were admissible, the state courts unreasonably applied clearly established Supreme Court precedent on the Massiah rule. See id.; see also United States v. Henry, 447 U.S. 264 (1980); Beatty v. United States, 389 U.S. 45 (1967) (per curiam) (discussed in Mealer, 741 F.2d at 1454, 1455) (notwithstanding that the government agent's questioning of the defendant focused on the "new crimes distinct from those for which the accused was already under indictment," and notwithstanding "that the government had a good faith interest in investigating . . . [the] new crime of suborning perjury," any use of the statements

thereby obtained as proof of the already charged or "past crimes" would violate the Sixth Amendment).

### 4. Harmless Error Analysis

Massiah violations are normally subject to harmless-error analysis. E.g., Milton v. Wainwright, 407 U.S. 371 (1972). For the purposes of habeas review, federal courts must assess the prejudicial impact of constitutional errors under the "substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). Fry v. Pliler, 551 U.S. 112, 114 (2007). Under this standard, an error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict. Fry, 551 U.S. at 116 (citation omitted).

In assessing the impact of a Massiah error, the court must judge how the jury would reasonably perceive the case without the constitutional error. Here, the proof adduced by the prosecution established that Jackson was upset because Miller had requested additional child support from him. Jackson made efforts to obtain a gun from a friend on the night of the murder, and seemed to be "rushed". In connection with the discussion about getting a gun, Jackson told this friend that he had to "make a move".  Jackson later told Talley that the gun he had used was obtained from, and returned to a friend.

Miller described Jackson's clothing on the night of the murder as a long black leather coat and a black hat. A witness saw a black man wearing a long black coat and a black hat looking furtive as he

left the Miller residence moments before the witness found Miller
bleeding from her head wounds. Similar clothes were found scattered
in an otherwise neat room at Petitioner's house within one hour of
the 911 call. Forensics testing revealed gunshot residue on the
leather coat, black pants, sweatshirt, and gloves retrieved from
Petitioner's residence and vehicle.

Miller said that she heard Petitioner's voice just before her
mother was shot, and heard her mother call out, "Oh, Junior"
(Petitioner's nickname), just before the first shot rang out. Miller
also testified that she saw who shot her, and it was Jackson. Miller
wrote Jackson's name in the snow when asked by the police officers
who had shot her.

Here, the proof of Jackson's guilt was so great that the
erroneous admission of Inv. Jones' testimony did not have a
"substantial and injurious effect or influence" on the jury's
verdict. Therefore, the Court concludes that any <u>Massiah</u> error was
harmless under <u>Brecht</u>.

**B.     Ground Two: Erroneous Admission of Testimony Regarding
Petitioner's Invocation of His Right to Counsel**

Petitioner contends that the trial court erroneously admitted
testimony regarding his invocation of the right to counsel, thereby
depriving him of a fair trial. Because defense counsel did not
challenge this statement as part of pre-trial hearings or at trial,
the Appellate Division concluded on direct appeal that the claim was
not preserved for appellate review. <u>People v. Jackson</u>, 41 A.D.3d at
1269-70 (citing N.Y. Crim. Proc. Law § 470.05(2)).

-15-

Respondent contends that the challenged decision "'rests on a state law ground that is independent of the federal question and adequate to support the judgment,'" Lee v. Kemna, 534 U.S. 362, 375 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). The Court agrees. The Second Circuit's case law "has long made clear" that New York's contemporaneous objection rule is just such a "'firmly established and regularly followed' rule," Whitley, 2011 2184287, at *7 (quoting Garcia, 188 F.3d at 77; other citation omitted)).

Jackson has established neither cause for his procedural default and resulting prejudice, nor that a fundamental miscarriage of justice will occur if this Court does not review the claim. Murray v Carrier, 477 U.S. 478, 496 (1986). The Court therefore dismisses Ground Two on the basis that it is subject to an unexcused procedural default.

**C.   Ground Three: Discriminatory Exercise of Peremptory Challenges**

Petitioner contends that the prosecution unlawfully exercised peremptory challenges with respect to two black prospective jurors, Crystal Manuel ("Manuel") and Dorothea Daniels ("Daniels").

When Manuel was challenged and excused, defense counsel did not object or otherwise raise the issue of any improper intent. It was only after Daniels was challenged that defense counsel made a Batson motion as to the already exercised peremptory challenge of Manuel.

-16-

The trial judge assumed for the sake of argument that Jackson had made a <u>prima</u> <u>facie</u> showing and moved the <u>Batson</u> inquiry to the second step, requesting a race-neutral reason from the prosecutor regarding the challenge to Manuel.

The prosecutor reminded the parties that on the previous day, Manuel was asked "if the People proved the case beyond a reasonable doubt would you vote guilty and she said I don't know." The judge asked Manuel "even if you thought he was guilty would you do so and she responded I would have a hard time saying he's guilty." The prosecutor noted that defense counsel attempted to rehabilitate her, but "those were her responses." The prosecutor stated that based upon Manuel's responses, he believed that she would have a difficult time finding Petitioner guilty regardless of the evidence produced against him.

With regard to Daniels, the prosecutor noted her close friendships with an individual who had been prosecuted for a homicide charge and convicted of a weapons offense, as well as an individual who was currently being prosecuted by the Erie County District Attorney's Office.

The prosecutor noted that he had seated two out of the four prospective black jurors, and that he had peremptorily struck a white juror who had indicated that he had a brother who had been prosecuted by the Erie County District Attorney's Office.

Defense counsel was not able to effectively rebut any of the prosecutor's race-neutral reasons. The trial court denied the <u>Batson</u> challenges.

On direct appeal, the Appellate Division concluded that the prosecutor had provided race-neutral reasons for exercising peremptory challenges with respect to two prospective jurors, and the trial court properly found that those reasons were not pretextual. These rulings were not incorrect as a matter of Federal law.

After the trial court sought race-neutral reasons for the peremptory challenges to the juror in question, the prosecutor clearly met the burden called for at <u>Batson</u>'s stage two, offering reasons that were facially neutral and supported by the jurors' own statements in open court. <u>See</u> <u>Batson</u>, 476 U.S. at 96-98.

Step three requires the trial court to resolve factual disputes; whether the prosecutor intended to discriminate is a question of fact. <u>Hernandez v. New York</u>, 500 U.S. 352, 364-65 (1991). If the trial court, after considering all of the circumstances, including the prosecutor's demeanor and credibility, concludes that a proffered reason is pretextual, defendant has carried his or her ultimate burden of proving intentional discrimination. <u>Id.</u> at 363-64.

<u>Batson</u>'s "final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and

never shifts from, the opponent of the strike.'" Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768); see also Miller-El v. Cockrell, 537 U.S. 322  (2003).

Here, the reasons proffered by the assistant district attorney were based upon the jurors' affirmative statements on the record, and they were entirely reasonable and not implausible. With regard to Manuel, the record amply supported the prosecutor's statement that her answers reflected a clear reluctance to follow the law if it conflicted with what she "really believed" about Petitioner's guilt.  See Majid v. Portuondo, 428 F.3d 112, 131 (2d Cir. 2005) (race-neutral reasons were plausible where they "could have raised . . . concerns about the degree of sympathy that the prospective jurors might feel for the defendants, the skepticism with which they might view the prosecution's case, and any other hesitation they might harbor about rendering a verdict adverse to the defendants"). Manuel also stated she found it very difficult to judge a person's credibility and veracity, which is a key function of being a juror.

Similarly, the reasons for striking Daniels were plausible and supported by the record. Daniels had close friends who had been charged with and convicted of crimes, and who were presently involved in the criminal justice system. Courts in this Circuit have accepted, as a satisfactory race-neutral reason, a prosecutor's explanation that prospective jurors had relatives who had been convicted of crimes. See, e.g., Green v. Travis, 414 F.3d at 300-01 (2d Cir. 2005) (finding that the "race-neutral explanations provided

-19-

by [the prosecutor] . . . all relied on the types of evidence that this Court has approved in support of establishing the racial neutrality of a peremptory challenge" where prosecutor "testified that in narcotics cases she avoided selecting jurors who had family members who had either been arrested or undergone negative experiences with the police").

Under the circumstances here, the state courts were not unreasonable in determining that the prosecutor was credible and the reasons for the peremptory strikes not pretextual. Accordingly, habeas relief is not warranted on Jackson's <u>Batson</u> claim.

## IV.  Conclusion

For the reasons stated above, Willie Jackson, Jr.'s request for writ of habeas corpus is denied, and the petition is dismissed. Because Petitioner has failed to make a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), in his conviction, the Court declines to issue a certificate of appealability.

**SO ORDERED.**

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

DATED:     June 23, 2011
           Rochester, New York